IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF OHIO
WESTERN DIVISION

Angel's Dream, LLC *et al.*,                                         Case No. 3:19-CV-1645-JGC

        Plaintiffs,

     v.                                                              **ORDER**

Toledo Jet Center, LLC *et al.*

        Defendants.

This is a breach of contract and negligence case. Plaintiffs, the purchasers of a Cessna Citation Bravo aircraft, have sued the seller—IAL Corp.; Dodson International Parts, Inc.; New Century Air Services, Inc.; and Robert L. Dodson, Jr. (collectively, the "Dodson Defendants")—and two aircraft inspection and maintenance companies, Toledo Jet Center, LLC and Dallas Airmotive, Inc. ("DAI") (Doc. 87). Toledo Jet has in turn crossclaimed against The Dodson Defendants and DAI. (Doc. 54).

Before me are two motions to dismiss: (1) a "Renewed Motion to Dismiss for Lack of Personal Jurisdiction of Defendants Dodson International Parts, Inc., IAL Corp., New Century Air Services, Inc., and Robert L. Dodson, Jr." (Doc. 95); and (2) "Defendant Dallas Airmotive Inc.'s Motion to Dismiss for Lack of Personal Jurisdiction and Failure to State a Claim" (Doc. 96).[1]

---

[1] Defendants previously moved to dismiss for lack of personal jurisdiction. (Docs. 51–53). In response, Plaintiffs and Cross-Plaintiffs propounded jurisdictional discovery and moved to compel answers. (Docs. 60, 62, 63). I granted the motions to compel, in part. (Doc. 76). After Defendants produced the requested documents, they filed these renewed motions to dismiss. (Docs. 95, 96).

For the reasons below, I grant in part and deny in part the Dodson Defendants' Motion to Dismiss, and I grant Dallas Airmotive's Motion to Dismiss.

### Background[2]

IAL is a corporation organized in Delaware and headquartered in Kansas; Dodson International Parts is organized and headquartered in Kansas; New Century is organized in Delaware and headquartered in Kansas; Robert L. Dodson, Jr. is an individual domiciled in Texas; and DAI is organized and headquartered in Texas.

### 1.    The Aircraft Purchase Agreement

According to the pleadings and declarations, Plaintiff Samuel Santa Rita and Defendant IAL Corp. entered into an Aircraft Purchase Agreement for the sale of a Cessna Citation Bravo personal jet. (Doc. 87, ¶ 29).

Before entering into the agreement, Mr. Santa Rita hired Ames Aviation—a company based in Henry County, Ohio—to conduct a "pre-buy" inspection of the aircraft. (*Id.* ¶ 91). Ames contacted DAI's Missouri office about a previous borescope[3] performed in Texas on the aircraft's engines. (*Id.* ¶¶ 92–95). The Missouri office apparently did not have any information or photographs of the inspection their Texas office performed. They told Ames as much. (*Id.*).

---

[2] I have already discussed this dispute's background in my prior order granting the motions to compel jurisdictional discovery. *Angel's Dream, LLC v. Toledo Jet Ctr., LLC*, 2023 WL 3891113, at *8 (N.D. Ohio Mar. 1, 2023) (Doc 76). I reproduce it in large part here, for easy reference.

[3] A Borescope is "an optical device (such as a prism or optical fiber) used to inspect an inaccessible space (such as an engine cylinder)". *Borescope*, Merriam-Webster Dictionary (rev. ed. 2022).

The contract parties then signed the Aircraft Purchase Agreement  on December 5, 2018.[4] There are no claims stemming from Ames's "pre-buy" inspection in this lawsuit.

As part of the agreement, Plaintiffs contracted a right to conduct another pre-purchase inspection of the aircraft (Doc. 87-1, § 3.3). The contract parties agreed that Toledo Jet, "acting as agent for Buyer," would conduct the inspection at its Toledo Express Airport facility in Swanton, Ohio. (*Id.*).

## 2.     Toledo Jet's Pre-purchase Inspection

Plaintiffs exercised this right, and the Dodson Defendants, as agreed, delivered the aircraft from their Kansas facility to Toledo Jet's facility in Ohio. (Doc. 87-1, § 3.3(a)). Satisfactorily passing the pre-inspection was a condition of the final sale. Plaintiffs had the option either to accept the aircraft—subject to any repairs that Toledo Jet identified during inspection—or reject it and return it to IAL. (*Id.* § 3.4(a)(i)–(ii)).

Key to this inspection was "airworthiness." Under FAA regulations, "[no] person may operate a civil aircraft unless it is in an airworthy condition." 14 C.F.R. § 91.7(a). The purpose of Toledo Jet's inspection was to ensure that the jet was airworthy and make any repairs needed to make it so. (Doc. 87-1, §§ 3.3, 3.3(d))

Once the Dodson Defendants delivered the aircraft to Ohio, Toledo Jet performed its inspection. The inspection included, among other things, a borescope camera inspection of the two jet engines. (Doc. 87, ¶ 104).

Toledo Jet wrote in its inspection report that on June 1, 2017, DAI previously performed, a borescope of the engines. DAI noted "minor nicks" in the engine at that time. (Doc. 87-17,

---

[4] Mr. Santa Rita subsequently assigned his rights in the agreement to the other Plaintiff entities, which he and his family control. (Doc. 87, ¶ 31).

pgID 1575). Toledo Jet performed its own borescope and "found no new damage." (*Id.*). Toledo Jet also conducted an "engine performance run" of both engines and noticed no defects during that test. (*Id.*)

Toledo Jet informed Plaintiffs that, while the jet was airworthy, it needed several repairs—*i.e.,* the "airworthiness discrepancies" described in the contract (Doc. 87, ¶ 106; Doc. 87-1, § 3.3(d)). The contract required that the Dodson Defendants be responsible for working with Toledo Jet in Ohio to remedy the discrepancies while Toledo Jet made the necessary repairs in at their Toledo Express Airport facility in Swanton, Ohio. (*See* Doc. 87-1, § 3.4(a)(2)).

Dodson corresponded with Toledo Jet's Ohio location by email regarding the scope of their repairs. For example, on December 17, 2018, a Dodson representative—presumably Defendant Robert Dodson—emailed a Toledo Jet employee regarding the aircraft sale. (Doc. 61-14). Mr. Dodson wrote that he needed to speak with Toledo Jet's general manager before Toledo Jet talked to Plaintiffs. (*Id.*). After, apparently, a phone call, Mr. Dodson specified which repairs he was willing to approve for Toledo Jet to make in Ohio. (*Id.*). Mr. Dodson then delivered parts into Ohio for Toledo Jets' repairs. (Doc. 60-1, ¶ 21).

Eventually, Toledo Jet completed its repairs, and it assured Plaintiffs that the jet was airworthy. (Doc. 87, ¶ 108). Relying on that assurance, Plaintiffs finalized their purchase and took possession of the aircraft. (*Id.*).

### 3.  Aircraft Damage Uncovered Post-Sale

At some point after the purchase, another maintenance shop noticed three "nicks" and one "tear" in one of the engines during routine maintenance. (*Id.* ¶ 109). After this discovery, Plaintiffs hired DAI to perform an engine inspection. (*Id.* ¶ 110).

DAI performed another borescope inspection on May 22, 2019. (*Id.*) They found multiple engine blades with "foreign object damage," including a blade tear on one blade. (*Id.*) DAI

4

determined that the engine was "unairworthy" and needed to be removed and repaired. (*Id.* ¶ 111).

The aircraft was thus grounded, unairworthy, and unable to be flown by Plaintiffs. (*See id.* ¶ 218).

About one month later, on July 19, 2019, Plaintiffs filed this lawsuit against Toledo Jet, claiming that Toledo Jet failed to identify the airworthiness defects that grounded the aircraft in May. (Doc. 1).

### 4. Discovery of the 2015 Runway "Excursion"

As this litigation proceeded, the parties issued third-party subpoenas to the Dodson Defendants and DAI, among others. (Doc. 87, ¶ 126). In September 2020, the Dodson Defendants and DAI produced responsive documents. (*Id.* ¶¶ 127–28).

The document productions showed an incident involving the aircraft engines that was previously unknown to Plaintiffs and Toledo Jet. (*See id.* ¶¶ 43, 141, 183). In September 2015, when the engines were on another aircraft, that aircraft was involved in a "runway excursion" in Australia—*i.e.*, an incident where the aircraft veers off the runway. (*Id.* ¶ 40).

After experiencing problems during takeoff, the aircraft captain aborted the takeoff and applied brakes and reverse thrust to stop the aircraft. (*Id.* ¶ 41). It did not stop in time and overran the runway. (*Id.*). While the pilots (the only passengers) were uninjured, the plane sustained damage as its landing gear broke off and it skidded to a stop in the grass and mud. (*Id.*).

The aircraft insurer salvaged some parts from the crashed plane, and the Dodson Defendants purchased the two jet engines. (*Id.* ¶ 45). Dodson hired DAI to perform their previously discussed 2017 inspection on the engines. (*Id.* ¶ 47).

DAI noted debris in the engine and "[m]inor [a]irfoil [n]icks." (*Id.* ¶ 137; Doc. 87-10; Doc. 87-18). It also took borescope photographs of the damage. (Doc. 87, ¶ 137). After performing an engine test run without incident, and without recertifying the engines, DAI returned the engines to Dodson. (*Id.* ¶ 133).

Dodson then installed the engines on a different aircraft. This is the plane Dodson eventually sold to Plaintiffs. He did not tell them about the runway incident. (*Id.* ¶ 79).

### 5.    Claims against Dodson and Dallas Airmotive

On August 2, 2021, Plaintiffs filed their First Amended Complaint. That Complaint added claims against new parties, the Dodson Defendants and DAI. (Doc. 24). Plaintiffs filed the current and operative Second Amended Complaint following the exchange of jurisdictional discovery. (Doc. 87).

Against the Dodson Defendants, Plaintiffs claim that (1) they failed to keep accurate logbooks as required by FAA regulations (the negligence *per se* claim); (2) they fraudulently conveyed the aircraft to Plaintiffs by concealing information about the engines' history and damage; and (3) they conspired with the various Dodson entities to convey the aircraft fraudulently. (*Id.* ¶¶ 164–198).

Against DAI, Plaintiffs' Second Amended Complaint claims that (1) DAI failed to keep accurate logbooks as required by FAA regulations (negligence *per se*); (2) it negligently[5] misrepresented the engine's status and certification in the logbooks; (3) it negligently misrepresented to Plaintiff's pre-purchase agent that it did not have borescope photographs; and

---

[5] Plaintiffs' ninth claim for relief is captioned "Fraudulent Misrepresentation against DAI – Logbooks." (Doc. 87, pgID 1436). However, the allegations themselves say that DAI's actions were a *negligent* misrepresentation where DAI "failed to exercise reasonable care." (*Id.* ¶¶ 211–14).

(4) it fraudulently misrepresented to Plaintiffs the contents of the logbooks and the existence of the borescope photographs. (*Id.* ¶¶ 199–238).

Toledo Jet crossclaimed against the Dodson Defendants and DAI on September 29, 2021. (Doc. 39). Its first and second crossclaims in the operative Cross-Complaint appear to be for negligent and fraudulent misrepresentations, respectively, against DAI. (Doc. 54). Its third crossclaim is for contribution against both DAI and the Dodson Defendants.

The Dodson Defendants and DAI have moved under Civil Procedure Rule 12(b)(2) to dismiss all claims against them. They argue that Ohio lacks personal jurisdiction over each of them, respectively. (Docs. 95, 96).

DAI has also moved for dismissal under Rule 12(b)(6) for failure to state a claim upon which relief can be granted. (Doc. 96, pgID 1741–56). However, because "[p]ersonal jurisdiction over a defendant is a threshold issue that must be present to support any subsequent order of the district court," I resolve it first. *See Citizens Bank v. Parnes*, 376 F. App'x 496, 501 (6th Cir. 2010).

## **Legal Standard**

A plaintiff bears the burden of establishing a court's personal jurisdiction over each defendant. *Air Prod. & Controls, Inc. v. Safetech Int'l, Inc.*, 503 F.3d 544, 549 (6th Cir. 2007). I have three procedural alternatives, none exclusive, when determining a motion to dismiss under Fed. R. Civ. P. 12(b)(2): I may (1) "determine the motion on the basis of affidavits alone"; (2) "permit discovery in aid of the motion"; or (3) "conduct an evidentiary hearing on the merits of the motion." *Malone v. Stanley Black & Decker, Inc.*, 965 F.3d 499, 505 (6th Cir. 2020) (internal quotation marks omitted).  Where, as here, I resolve the issue on the written submissions, without an evidentiary hearing, the burden is relatively slight; "the plaintiff must make only a

7

*prima facie* showing that personal jurisdiction exists in order to defeat dismissal[.]" *AlixPartners, LLP v. Brewington*, 836 F.3d 543, 549 (6th Cir. 2016) (internal quotation marks omitted).

I must view the submitted pleadings and affidavits in the light most favorable to the plaintiff. *Id.* I do not give weight to "the controverting assertions of the party seeking dismissal." *Theunissen v. Matthews*, 935 F.2d 1454, 1459 (6th Cir. 1991); *accord Palnik v. Westlake Ent., Inc.*, 344 F. App'x 249, 251 (6th Cir. 2009) ("We are to determine whether [plaintiff] has made [a] prima facie case based on [plaintiff's] allegations, and only [plaintiff's] allegations; the defendants' affidavits contradicting the facts are irrelevant.").

But a slight burden is not no burden. Plaintiffs must still "establish[] with reasonable particularity those specific facts that support jurisdiction." *Palnik, supra*, 344 F. App'x at 251 (internal quotation marks omitted); *see also Theunissen, supra*, 935 F.2d at 1458 ("[T]he plaintiff may not stand on his pleadings but must, by affidavit or otherwise, set forth specific facts showing that the court has jurisdiction.").

## Discussion

The Dodson Defendants and DAI have separately moved to dismiss, arguing that I lack personal jurisdiction. (Docs. 95, 96). The Fourteenth Amendment Due Process clause restricts a state's authority to exercise jurisdiction in their state and federal courts over a nonresident defendant. *World-Wide Volkswagen Corp. v. Woodson*, 444 U.S. 286, 291 (1980). A defendant lacking sufficient contacts to a state cannot be haled in court to a state where it is a stranger. *See Int'l Shoe Co. v. State of Wash., Off. of Unemp't Comp. & Placement*, 326 U.S. 310, 316 (1945). But where a nonresident defendant has sufficient contacts with the forum state, it may be subject to its jurisdiction without offending "traditional notions of fair play and substantial justice." *Id.*

8

### 1.  The Personal Jurisdiction Doctrines

The nature and extent of a defendant's contacts are important; they determine under which of the two personal jurisdiction doctrines a defendant falls. *First*, a state may have *general* personal jurisdiction over a defendant whose contacts with the forum are "so continuous and systematic as to render them essentially at home in the forum State." *Goodyear Dunlop Tires Operations, S.A. v. Brown*, 564 U.S. 915, 919 (2011). Under this "all-purpose" general jurisdiction, a state may hear any and all claims against a defendant regardless of the nature or origin of the claim. *Id.*

*Second*, in contrast, a defendant may be subject to *specific* personal jurisdiction where it has "certain minimum contacts" with the forum and the suit arises out of or is related to those contacts. *Helicopteros Nacionales de Colombia, S.A. v. Hall*, 466 U.S. 408, 414 & n.8 (1984) (citing *Int'l Shoe, supra*, 326 U.S. at 316). This is both more restrictive than general jurisdiction, in that it requires the contacts be related to the lawsuit, and less restrictive, in that it can subject a defendant that has its jurisdictional "home" elsewhere to state authority.

Plaintiffs originally sought jurisdictional discovery to establish specific *and general* personal jurisdiction over the Defendants. In opposition to the renewed Motions to Dismiss, Plaintiffs now limit their arguments to specific jurisdiction. This is correct, as neither the Dodson Defendants nor DAI are "essentially at home" in Ohio. *See Flake v. Schrader-Bridgeport Int'l, Inc.*, 538 F. App'x 604, 617 (6th Cir. 2013) (quoting *Goodyear, supra*, 564 U.S. at 919); *see also Angel's Dream, LLC v. Toledo Jet Ctr., LLC*, 2023 WL 3891113, at *8 (N.D. Ohio Mar. 1, 2023). I limit my discussion to Plaintiff's assertion of specific personal jurisdiction.

For specific jurisdiction, a plaintiff must show both that the defendant is amenable to suit under Ohio's long-arm statute and that exercising jurisdiction would comport with the constitutional due process standard of "minimum contacts." *Air Prod., supra*, 503 F.3d at 550.

9

## 2. Specific Jurisdiction under the Ohio Long-Arm Statute

The first inquiry is whether the Ohio long-arm statute allows the exercise of jurisdiction. The Ohio General Assembly amended the state long-arm statute in 2020, effective April 7, 2021, allowing courts to "exercise personal jurisdiction over a person on any basis consistent with the Ohio Constitution and the United States Constitution." *See* Ohio Rev. Code Ann. § 2307.382(C) (eff. Apr. 7, 2021).

Ohio's state and federal courts disagree on whether this amendment now extends Ohio long-arm jurisdiction to the limits of federal law. When presented with the issue, Ohio state courts have declined to resolve it. *See Herold v. Venetis*, 2023-Ohio-3829 (12th Dist. Ct. App.) (declining to decide the merger issue); *Ricker v. Mercedes-Benz of Georgetown*, 191 N.E.3d 1179, 1187 (Ohio 12th Dist. Ct. App.) (same); *see also A.B. Pratt & Co. v. Bridgeport Grp., LLC*, 2023 WL 2865640, at *7 (N.D. Ohio Apr. 10, 2023) (Barker, J.) (collecting Ohio courts of appeals cases). As the Ohio Supreme Court has not addressed the issue, I must "predict how the Ohio Supreme Court would rule if it considered the issue." *Liberty Ford Lincoln Mercury, Inc. v. Ford Motor Co.*, 644 F. Supp. 3d 417, 422 (N.D. Ohio 2022) (Calabrese, J.) (citing *Allstate Ins. Co. v. Thrifty Rent-A-Car Sys., Inc.*, 249 F.3d 450, 454 (6th Cir. 2001)).

Federal district courts in this state are split. *Compare Bren Ins. Servs., Inc. v. Envision Pharm. Servs., LLC*, 2022 WL 5160746, at *4 (N.D. Ohio Oct. 5, 2022) (Lioi, J.)  (holding that the amended Ohio long-arm statute is now coextensive and merged with federal law), *and C.T. v. Red Roof Inns, Inc.*, 2021 WL 2942483, at *10 (S.D. Ohio July 1, 2021) (same), *with Premier Prop. Sales Ltd. v. Gospel Ministries Int'l, Inc.*, 539 F. Supp. 3d 822, 827 n.2 (S.D. Ohio 2021) (holding that the Ohio long-arm amendment applies only to *general* personal jurisdiction, and therefore the long-arm and due process analyses have not merged). *But cf. AmaTech Grp. Ltd. v. Fed. Card Servs., LLC*, 2022 WL 44674, at *5 (S.D. Ohio Jan. 5, 2022) ("Most of the courts to

10

address the amended language have concluded that Ohio's long-arm statute now extends

personal jurisdiction to the fullest extent that the U.S. Constitution permits.").

I agree with the courts that construe the Ohio long-arm statute to extend to the limits of

federal due process and "minimum contacts" under *International Shoe Co. v. Washington*, 326

U.S. at 316. The plain language of § 2307.382(C) allows for jurisdiction "on any basis consistent

with the Ohio Constitution and the United States Constitution," without qualification as to

specific or general jurisdiction. *See Akron v. Rowland*, 618 N.E.2d 138, 144 (Ohio 1993) ("[I]t is

not the province of the court, under the guise of construction, to ignore the plain terms of a

statute or to *insert a provision not incorporated therein by the Legislature.*"); *Time Warner AxS

v. Pub. Util. Comm.*, 661 N.E.2d 1097, 1104 (Ohio 1996) ("Where the language [of a statute]

[. . .] clearly expresses the legislative intent, the courts need look no further because at that point

the interpretive effort is at an end, and the statute must be applied accordingly.") (internal

quotation marks omitted).

Other jurisdictions have interpreted functionally identical language in other long-arm

statutes in the same manner—even those with, as in Ohio, enumerated provisions or sections.

*See, e.g.*, *Hyatt Int'l Corp. v. Coco*, 302 F.3d 707, 714 (7th Cir. 2002) ("[T]he Illinois long-arm

statute now 'permits its courts to exercise jurisdiction on any basis permitted by the Illinois and

United States Constitutions.'"); *State v. NV Sumatra Tobacco Trading Co.*, 403 S.W.3d 726, 740

(Tenn. 2013) (recognizing that the Tennessee long-arm statute is coextensive with federal law

because it allows jurisdiction on "[a]ny basis not inconsistent with the constitution of this state or

of the United States.") (quoting Tenn. Code § 20-2-225); *LinkAmerica Corp. v. Cox*, 857 N.E.2d

961, 967 (Ind. 2006) ("The ['any basis' amendment to the Indiana long-arm statute] was

intended to, and does, reduce analysis of personal jurisdiction to the issue of whether the exercise

11

of personal jurisdiction is consistent with the Federal Due Process Clause. *Retention of the enumerated acts found in [the statute] serves as a handy checklist of activities that usually support personal jurisdiction but does not serve as a limitation on the exercise of personal jurisdiction by a court of this state.*") (emphasis added); *Petroleum Helicopters, Inc. v. Avco Corp.*, 513 So. 2d 1188, 1192 (La. 1987) ("The ['any basis' amendment language] was designed to ensure that the long-arm jurisdiction of a Louisiana court extends to the limits allowed by due process."). These cases are on-point and persuasive. I have not located any other state's decision reaching a contrary result.[6]

---

[6] Even assuming the statutory language is ambiguous, the amendment's legislative history demonstrates the legislature's intent to expand Ohio personal jurisdiction to the boundaries of due process. Ohio Rev. Code § 1.49 ("If a statute is ambiguous, the court, in determining the intention of the legislature, may consider among other matters: (A) The object sought to be attained; (B) The circumstances under which the statute was enacted; [or] (C) The legislative history . . . ."); *Kings Dodge, Inc. v. Chrysler Grp., LLC*, 595 F. App'x 530, 535 (6th Cir. 2014) ("Where a statute's meaning is ambiguous, Ohio courts may engage in statutory interpretation, guided by the principles of construction found in Ohio Revised Code section 1.49[.]").

Senate Bill 10 (of the 133rd General Assembly of Ohio) amended § 2307.382(C) of the long-arm statute. 2020 Ohio Laws File 94 (Am. Sub. S.B. 10). Representative Scott Oelslager proposed that amendment during the House of Representatives' consideration of S.B. 10. H. Journal, 133rd Gen. Assemb., at 1933–34 (Ohio, June 9, 2020). The Ohio governor signed S.B. 10, including Representative Oelslager's long-arm amendment, into law on January 7, 2021. 2020 Ohio Laws 94.

Concurrently with S.B. 10, Representative Oelslager, along with Representative Brett Hudson Hillyer, sponsored House Bill 272, of the 133rd General Assembly. 2020 Ohio Laws File 44 (Am. H.B. 272). H.B. 272 contained identical language regarding the Ohio long-arm statute. The Ohio governor signed it into law on September 16, 2020. *See id.*

Representatives Oelslager and Hillyer provided written testimony to the Senate Judiciary Committee during that committee's consideration of the identical amendment in H.B. 272. *Hearing on S.B. 10 Before the S. Comm. on the Judiciary*, 133rd Gen. Assemb., 2019–2020 Sess. (Ohio, Feb. 12, 2020) (joint written statement of Rep. Scott Oelslager and Rep. Brett Hudson Hillyer). The amendment proponents explained their intention to expand Ohio jurisdiction "as far as the 'minimum contacts' standard allowed by the Supreme Court." *Id.* They did not want the law to "limit[] the number of out-of-state defendants that Ohio could exercise jurisdiction over." *Id.* Instead, they testified that expanding Ohio long-arm jurisdiction would "put Ohio on equal footing with a majority of jurisdictions throughout the country." *Id.*

Plaintiffs originally filed this case on July 19. 2019 before the amendment took effect. (*See* Doc. 1). At that time, Plaintiffs only alleged claims against Defendant Toledo Jet Center, LLC. (*Id.*). During discovery, the parties subpoenaed documents from the Dodson Defendants and DAI, among others. (Doc. 87, ¶¶ 126–28). Based on this information, Plaintiffs filed their First Amended Complaint on August 2, 2021, adding the Dodson Defendants and DAI to the lawsuit. (*See* Doc. 24). These Defendants joined the lawsuit after the long-arm amendment took effect.

So the issue arises as to which version of the Ohio long-arm statute applies here. If it is the former, pre-amendment version, I analyze Defendants' contacts under the applicable enumerated bases for Ohio personal jurisdiction. *See Chulsky v. Golden Corral Corp.*, 583 F. Supp. 3d 1059, 1072 (S.D. Ohio 2022); *Goldstein v. Christiansen*, 638 N.E.2d 541, 545 n.1 (Ohio 1994) (requiring a separate analysis under the long-arm statute because the prior version of the statute did not extend as far as Federal Due Process).

If it is the later version of the statute, I need not do so because the current long-arm statute extends to "any basis consistent with . . . the United Stated Constitution." Ohio Rev. Code § 2307.382(C); *accord Bren, supra*, 2022 WL 5160746, at *4 ("[B]ecause Ohio's long-arm statute allows the exercise of personal jurisdiction to the full extent permissible under the U.S. Constitution, this Court's inquiry is confined to whether exercising personal jurisdiction over Bailey comports with traditional notions of fair play and substantial justice.") (internal quotation marks omitted). The Due Process Clause of the Fourteenth Amendment sets the absolute floor for permissible personal jurisdiction. While the prior version of the Ohio long-arm statute was

---

Based on this history, I conclude that it is irrefutably clear the General Assembly sought to protect its citizens by allowing Ohio courts to exercise the full breadth of jurisdictional reach— general and specific—allowed under the U.S. Constitution.

more restrictive, the current statute meets due process at the jurisdictional floor and allows me to exercise personal jurisdiction "on any basis" allowed by the U.S. Constitution. Ohio Rev. Code § 2307.382(C). Thus, the analyses merge.

### 3.     Specific Jurisdiction under Federal Due Process

"The Fourteenth Amendment's Due Process Clause limits a state court's power to exercise jurisdiction over a defendant." *Sullivan v. LG Chem, Ltd.*, 79 F.4th 651, 670 (6th Cir. 2023). A nonresident defendant must have "certain minimum contacts . . . such that the maintenance of the suit does not offend 'traditional notions of fair play and substantial justice.'" *Walden v. Fiore*, 571 U.S. 277, 283 (2014) (quoting *Int'l Shoe, supra*, 326 U.S. at 316. The "minimum contacts" analysis focuses on "the relationship among the defendant, the forum, and the litigation." *Id.* at 284.

Courts in the Sixth Circuit use a three-part test to determine whether a nonresident defendant possesses sufficient contacts with the forum so as to comport with federal due process:

> First, the defendant must purposefully avail himself of the privilege of acting in the forum state or causing a consequence in the forum state. Second, the cause of action must arise from the defendant's activities there. Finally, the acts of the defendant or consequences caused by the defendant must have a substantial enough connection with the forum state to make the exercise of jurisdiction over the defendant reasonable.

*Air Prod. & Controls, Inc. v. Safetech Int'l, Inc.*, 503 F.3d 544, 550 (6th Cir. 2007) (quoting *S. Mach. Co. v. Mohasco Indus., Inc.*, 401 F.2d 374, 381 (6th Cir. 1968)).

The first element, "purposeful availment," is the oft-recognized "sine qua non for in personam jurisdiction." *Id.* It "ensures that a defendant will not be haled into a jurisdiction solely as a result of random, fortuitous, or attenuated contacts, . . . or of the unilateral activity of another party or a third person[.]" *AlixPartners, LLP v. Brewington*, 836 F.3d 543, 550 (6th Cir. 2016) (quoting *Burger King Corp. v. Rudzewicz*, 471 U.S. 462, 475 (1985)). The requirement focuses

14

on "whether the defendant has engaged in some overt actions connecting the defendant with the forum state." *Beydoun v. Wataniya Restaurants Holding, Q.S.C.*, 768 F.3d 499, 506 (6th Cir. 2014).

If Plaintiffs fail to show "purposeful availment," I do not reach the remaining two elements. *See Mohasco, supra*, 401 F.2d at 383 ("So it is clear that [defendant] has purposely availed itself of the privilege of transacting business in [the state]; therefore, we can proceed to the second inquiry[.]"). Indeed, the second and third inquiry depend on my finding some "overt actions" connecting the defendant and the state. If there is no purposeful contact with the forum state to begin with, I cannot analyze whether such a contact is related to Plaintiff's claims or whether the contact is substantial enough so as to make jurisdiction reasonable.

### 4.  Personal Jurisdiction over the Dodson Defendants

The Dodson Defendants argue that they meet none of the three elements: that they have not purposefully availed themselves of the privilege of acting in Ohio, that their alleged contacts are unrelated to this lawsuit, and that their alleged contacts are not substantial enough to warrant jurisdiction. (Doc. 95, pgID 1679–82). They also argue that not all of the Dodson entities have contacts with Ohio. (Doc. 98, pgID 1790).

As I have already said, the pleadings and declarations demonstrate the Dodson Defendants' case-related contacts with Ohio. *Angel's Dream, LLC v. Toledo Jet Ctr., LLC*, 2023 WL 3891113, at *7 (N.D. Ohio Mar. 1, 2023).

IAL Corporation and its principal, Robert L. Dodson, Jr., agreed specifically in the sales contract that Toledo Jet, an Ohio entity, would perform the predicate inspection of the aircraft in Ohio, prior to the deal's closing. They agreed that they would deliver the aircraft to Toledo Jet's Swanton, Ohio facility, and they did so. They agreed to pilot a one-hour test flight in Ohio, where the aircraft would remain in the "care[,] custody, command and control" of IAL and

15

Robert Dodson during its operation. (Doc. 87-1, ¶ 3.3(b)). They specified the scope of work Toledo Jet was to perform in Ohio. They agreed to pay for certain maintenance issues uncovered during the Ohio inspection.

Dodson International Parts and Robert Dodson instructed Toledo Jet not to speak to Plaintiffs regarding the subject aircraft until first speaking with them. (Doc. 61-14). They supplied parts to Ohio to facilitate those repairs. (*Id.*) Finally, they corresponded with and directed Toledo Jet on its Ohio-based inspection and repairs. (*Id.*).

This string of contacts was not random or attenuated; they were "purposefully aimed at, and tied to," Ohio. *See AlixPartners, supra*, 836 F.3d at 550. Robert Dodson, IAL Corporation, and Dodson International Parts should have reasonably anticipated being haled into an Ohio court based on their frequent interactions with Ohio.

Further, Plaintiff's claims against the Dodson Defendants arise from the above contacts. The contacts all relate to the aircraft sale and pre-purchase inspection in Ohio that form the gravamen of this lawsuit.

Finally, these contacts were significant. Without them, the subject aircraft never would have ended up in Ohio. Robert Dodson and IAL Corporation *flew it into the state*. And Robert Dodson and Dodson International Parts delivered parts and directed the activities of Toledo Jet's Ohio work on the aircraft.

However, Plaintiffs have not demonstrated that *all* of the Dodson Defendants have sufficient minimum contacts with Ohio. *See Days Inns Worldwide, Inc. v. Patel*, 445 F.3d 899, 904 (6th Cir. 2006) ("Personal jurisdiction must be analyzed and established over each defendant independently."). According to the Second Amended Complaint, IAL Corporation "caused New Century [Air Services, Inc.] to install the Aircraft Engines on the [aircraft] on or about

16

November 22, 2017." (Doc. 87, ¶ 86). Plaintiffs do not support this allegation with an affidavit or any other evidence. *See Theunissen v. Matthews*, 935 F.2d 1454, 1459 (6th Cir. 1991).

It is unclear where the engine installation occurred. I also cannot determine whether New Century, at the time, had any knowledge that the aircraft on which they installed the engines would end up in Ohio for some future pre-purchase inspection.

Plaintiffs do not demonstrate how New Century, as an entity distinct from its Co-Defendants, purposefully availed itself of the privilege of acting in Ohio. Based on the record before me, New Century took no action, overt or otherwise, directed at this state. *See Beydoun, supra*, 768 F.3d 499 at 506. Plaintiffs also offer no reason for me to collapse my analysis and treat New Century as an alter ego of another Dodson entity. *See Anwar v. Dow Chem. Co.*, 876 F.3d 841, 848 (6th Cir. 2017) (explaining the alter-ego theory of personal jurisdiction).

Therefore, I deny the Dodson Defendants' Motion as to Dodson International Parts, Inc.; IAL Corp.; and Robert L. Dodson, Jr. I grant the Dodson Defendants' Motion as to New Century Air Services, Inc., and I dismiss New Century from this case.

### 5. Personal Jurisdiction over Dallas Airmotive

DAI argues that Plaintiffs have not met the three elements necessary for me to assert jurisdiction over DAI. (Doc. 96, pgID 1735–39; Doc. 100, pgID 1839–40)). Plaintiffs respond that DAI established jurisdictional contacts with Ohio by placing the aircraft logbooks and services into the stream of commerce and by communicating with Plaintiffs' Ohio agent regarding the logbooks and borescope photographs. (Doc. 99, pgID 1811–16).

### a. The Aircraft Logbooks

Plaintiffs argue that DAI purposefully availed itself of the privilege of acting in Ohio when it placed the plane's logbooks into the stream of commerce and communicated with

17

Plaintiffs' Ohio agent regarding the logbooks and borescope photographs. (Doc. 99, pgID 1811–13). I disagree.

DAI did not purposefully avail itself of the privilege of acting within Ohio. Relevant here, the Sixth Circuit has adopted the "stream of commerce 'plus'" analysis, as explained in the plurality opinion in *Asahi Metal Industry Company, Ltd. v. Superior Court*, 480 U.S. 102 (1987) (O'Connor, J.) (plurality op.). *Bridgeport Music, Inc. v. Still N The Water Pub.*, 327 F.3d 472, 480 (6th Cir. 2003) ("[W]e make clear today our preference for Justice O'Connor's stream of commerce 'plus' approach, for the reasons set forth in that opinion . . . ."). Under this theory, "[t]he placement of a product into the stream of commerce, without more, is not an act of the defendant purposefully directed toward the forum State." *Id.* at 479 (quoting *Asahi, supra*, 480 U.S. at 112).

DAI did not place logbooks in the stream of commerce. DAI is a business that provides aircraft "engine inspection and repair services." (Doc. 87, ¶ 18(a)). DAI is not in the business of selling or distributing logbooks.

The fact that aircrafts have "logbooks" that travel with them and contain descriptions of work performed on it is incidental to DAI's inspection and repair work. To put it another way, DAI sells services, not logbooks.

The logbook at issue here is too attenuated a contact. *See AlixPartners, supra*, 836 F.3d at 550. DAI made its logbook entries in Texas. It then delivered the plane back to the Dodson Defendants in Kansas. Dodson's subsequent decisions to sell the plane to an Indiana resident and to agree to a pre-purchase inspection in Ohio were "pretty much out of [DAI's] hands." *Palnik v. Westlake Ent., Inc.*, 344 F. App'x 249, 251 (6th Cir. 2009) (quoting and discussing *Bridgeport*

*Music, supra*, 327 F.3d at 480). DAI could not have reasonably foreseen that the logbooks would end up in Swanton, Ohio.

Therefore, I conclude that the logbooks do not establish the "minimum contacts" required for Ohio to exercise personal jurisdiction over DAI.

### b. DAI's Aircraft Inspection Services

According to Plaintiffs, "DAI regularly solicited and performed work in Ohio." (Doc. 99, pgID 1813). Plaintiffs appear to argue that these contacts serve as another "plus" factor in a stream of commerce analysis. But the cases that follow the stream of commerce "plus" analysis concern the placement of *products* into the stream of commerce. *See, e.g.*, *Asahi, supra*, 480 U.S. at 107 (tire valve assemblies); *Bridgeport Music, supra*, 327 F.3d at 476 (music publications and sound recordings); *Palnik, supra*, 344 F. App'x at 250 (movies and music); *Smith v. Home Depot USA, Inc.*, 294 F. App'x 186, 187 (6th Cir. 2008) (ladders). The claims against DAI, are not about a product; they are about a service that DAI performed and concluded in Texas.

When an entity creates and sells a product, that product—and any defects or liabilities— travel with it. The exemplar scenario is where a seller places defective merchandise in the stream of commerce, and the merchandise ends up causing an injury in another state. *See World-Wide Volkswagen Corp. v. Woodson*, 444 U.S. 286, 297 (1980); *see also Ford Motor Co. v. Montana Eighth Jud. Dist. Ct.*, 592 U.S. 351, 364 (2021) (discussing *World-Wide Volkswagen* as "a paradigm case of specific jurisdiction").

Services like those provided by DAI are different. They have a beginning and an end. Once the service is complete, it is done. It does not travel, as does a product. *See Doan v. Consumer Testing Lab'ys (Far E.) Ltd.*, 105 F.3d 654 (5th Cir. 1996) ("[T]he services [defendant] provides are not the conduit (or a link therein) by which products enter into the

19

stream of commerce . . . ."); *Burman v. Phoenix Worldwide Indus., Inc.*, 437 F. Supp. 2d 142, 149 (D.D.C. 2006) ("[P]laintiffs fail to provide, and the Court is unable to find, any case authority in this Circuit that supports the notion that the stream of commerce theory applies to services rendered, as a defendant's liability for faulty manufactured products was the sole focus of the Supreme Court's discussion in *Asahi*."); *Specialty Surfaces Int'l, Inc. v. Athletic Surfaces Plus, LLC*, 2013 WL 12101062, at *2 (N.D. Ga. June 26, 2013) ("As [defendant] is not a vendor of goods but a provider of services, the 'stream of commerce theory[]' . . . does not apply to this case."); *Kellman v. Whole Foods Mkt., Inc.*, 313 F. Supp. 3d 1031, 1046 (N.D. Cal. 2018) ("[W]here '[the services provider] itself has not put any products into the stream of commerce that might have ended up in the forum, whether through a distributorship agreement or otherwise[, t]hat alone ends the inquiry.'") (quoting *Holland Am. Line Inc. v. Wartsila N. Am., Inc.*, 485 F.3d 450, 459 (9th Cir. 2007)); *Kimball Union Acad. v. Genovesi*, 70 A.3d 435, 443 (N.H. 2013) ("This is not, however, a products liability case, or even a case in which a manufacturer places a product into the 'stream of commerce' without directing it to a specific destination. Thus, . . . the 'stream of commerce plus˙ analysis is of doubtful application here."); *see also Carefree Cartage, Inc. v. "K" Line*, No. 06 C 2644, 2006 WL 3227892, at *4 (N.D. Ill. Nov. 2, 2006) ("[Defendants] are paid to load and unload cargo [from a ship], a job that begins and ends in the port."); *Rivera v. Atl. City Med. Ctr.*, 2006 WL 851717, at *2 (S.D.N.Y. Mar. 30, 2006) ("Unlike a manufacturer who introduces a product into the stream of commerce expecting it to be sold in other States, a physician treating patients in his or her home State is providing a service that is inherently personal, and local, in nature.").

The stream of commerce "plus" test does not apply to the services that DAI solicits and

provides. Therefore, Plaintiffs have not shown, on this basis, that DAI purposefully availed itself of the privilege of operating in Ohio.

### c.  Communications with Plaintiffs' Ohio Agent

Likewise, the communications between Plaintiffs' Ohio agent and DAI are not the product of DAI's purposeful and intentional contacts with Ohio. The contact occurred when Ames Aviation, Plaintiffs' agent, contacted DAI's Missouri representative. Ames asked DAI if they had borescope photographs from their inspection of the subject aircraft. DAI responded they did not.

DAI did not reach into Ohio to make the contact with this state. It was the other way around. That DAI's Missouri field representative received an unsolicited phone call from somebody in Ohio is "random, fortuitous, [and] attenuated." *See AlixPartners, supra*, 836 F.3d at 550. DAI had no control over Ames's decision to contact DAI's Missouri employee. It is not even clear from the record whether DAI knew that Ames called it from within Ohio.

"The unilateral activity of those who claim some relationship with a nonresident defendant cannot satisfy the requirement of contact with the forum State." *Burger King Corp. v. Rudzewicz*, 471 U.S. 462, 474 (1985). That is precisely what happened here. A state does not obtain personal jurisdiction over a defendant merely because they answered the phone. Due process requires more. *Walden v. Fiore*, 571 U.S. 277, 284 (2014) ("[T]he relationship must arise out of contacts that the defendant *himself* creates with the forum State.") (internal quotation marks omitted).

Therefore, the communications between DAI and Plaintiffs' agent do not show the "minimum contacts" necessary to establish personal jurisdiction. Plaintiffs have failed to make a *prima facie* showing of personal jurisdiction over DAI. I grant DAI's Motion and dismiss it from

this case. As I do not have jurisdiction over DAI, I reach no decision regarding the 12(b)(6) portion of its Motion.

## Conclusion

It is, therefore, ORDERED THAT:

1. The Renewed Motion to Dismiss for Lack of Personal Jurisdiction of Defendants Dodson International Parts, Inc., IAL Corp., New Century Air Services, Inc., and Robert L. Dodson, Jr. (Doc. 95) be, and the same hereby is, granted in part and denied in part.

2. New Century Air Services, Inc. be, and the same hereby is, dismissed from this case.

3. I maintain personal jurisdiction over Dodson International Parts, Inc.; IAL Corp.; and Robert L. Dodson, Jr.

4. Defendant Dallas Airmotive Inc.'s Motion to Dismiss for Lack of Personal Jurisdiction (Doc. 96) be, and the same hereby is, granted.

5. Dallas Airmotive Inc. be, and the same hereby is, dismissed from this case.

6. The clerk shall forthwith set a status/scheduling conference at a date and time convenient for the parties.

SO ORDERED.

*/s/ James G. Carr*
Sr. U.S. District Judge
